FARMERS NATIONAL BANK; First State Financial, Inc.; Kentucky Bankers Association, Appellants

v.

COMMONWEALTH of Kentucky, DEPARTMENT OF REVENUE; Michael O'Connell, Jefferson County Attorney; Barbara Holsclar, Jefferson County Clerk; John Aubrey, Jefferson County Sheriff, Appellees

NO. 2013–CA–000001–MR

Court of Appeals of Kentucky.

RENDERED: MAY 22, 2015; 10:00 A.M.

Discretionary Review Denied by Supreme Court April 27, 2016

Oral Argument and Briefs for Appellant: M. Thurman Senn, Louisville, Kentucky.

Briefs for Appellant: John T. McGarvey, J. Morgan McGarvey, Louisville, Kentucky.

Oral Argument and Brief for Appellee, Commonwealth of Kentucky, Department of Revenue: Bethany Atkins Rice, Office of General Counsel, Frankfort, Kentucky.

Oral Argument for Appellees, Michael O'Connell, Jefferson County Attorney; Barbara Holsclar, Jefferson County Clerk; John Aubrey, Jefferson County Sheriff: William P. O'Brien, Louisville, Kentucky.

Brief for Appellees, Michael O'Connell, Jefferson County Attorney; Barbara Holsclar, Jefferson County Clerk; John Aubrey, Jefferson County Sheriff: N. Scott Lilly, Terri Geraghty, Assistant Jefferson County Attorneys, Louisville, Kentucky.

BEFORE: ACREE, CHIEF JUDGE; TAYLOR AND VANMETER, JUDGES.

## OPINION

### ACREE, CHIEF JUDGE:

Appellants, Kentucky banks and the trade association to which they belong (the Banks), appeal from the Franklin Circuit Court's November 29, 2012 order granting summary judgment in favor of Appellees, the Commonwealth of Kentucky Department of Revenue and various Jefferson County officials (the Department). On appeal, the Banks challenge the constitutionality of certain provisions of KRS [1] Chapter 134 allowing the sale of delinquent tax certificates to third-party purchasers.

---

1. Kentucky Revised Statutes.

While Banks present compelling evidence that this practice may be susceptible to abuse, it is constitutionally sound. Furthermore, we conclude that the statutory scheme for notice to mortgagees of the sales of delinquent tax certificates set forth in KRS Chapter 134 do not offend the Due Process Clause of the 14th Amendment to the United States Constitution. Accordingly, we affirm the Franklin Circuit Court's grant of summary judgment.

## I. Facts and Procedure

Like all state governments, ours is authorized to collect taxes. *See* Ky. Const. § 3. KRS Chapter 134 provides the statutory framework for collecting *ad valorem* taxes owed to the Commonwealth, its counties, and their respective tax districts. *Ad valorem* taxes provide revenue for Kentucky schools, and other essential public services. However, tax delinquency impairs our government's ability to maintain a consistent stream of tax revenue, and thus frustrates its ability to fund its endeavors. To combat tax delinquency, our General Assembly enacted legislation permitting the sale of long-delinquent tax bills, known as "certificates of delinquency" (tax certificates) to private, third-party purchasers. Third-party purchasers buy these tax certificates, and in doing so, satisfy the tax debt. In exchange, third-party purchasers may recoup the cost of tax certificates as well as additional fees generated during collection proceedings.

The General Assembly takes the position that the sale of tax certificates to third-party purchasers is essential to sustaining a stable stream of tax revenue:

The General Assembly recognizes that third-party purchasers play an impor-

tant role in the delinquent tax collection system, allowing taxing districts to receive needed funds on a timely basis. The General Assembly has carefully considered the fees and a charge authorized by this section, and has determined that the amounts established are reasonable based on the costs of collection and fees and charges incurred in litigation. KRS 134.452(5). A fuller discussion of the statutory scheme governing this process is appropriate.

## A. Collecting *Ad Valorem* Taxes under KRS Chapter 134

Each year, property valuation administrators (PVAs) levy taxes upon real property located in their respective counties. KRS 133.040. The county clerk creates tax bills for each taxpayer whose property has been assessed, and then mails these tax bills to the county sheriff before September 15 each year. KRS 133.220(2)-(3). Initially, the county sheriff is responsible for collecting these tax bills. However, payment "may be directed by law" to another state officer pursuant to statute. KRS 134.119. Taxpayers may pay these bills immediately and receive a discount for early payment. KRS 134.015(2).

Taxpayers have until December 31 to pay their bills without penalty. KRS 134.014(1). After December 31, unpaid taxes become delinquent and interest begins to accrue. KRS 131.183.

All tax bills that remain delinquent on April 15 are transferred by the sheriff to the county clerk. KRS 134.122(1)(a). The county clerk then issues a "Certificate of Delinquency"—the tax certificate. KRS 134.122(2)(a). Tax certificates serve as liens against the parcels of property at issue. KRS 134.420(1). The jurisdiction entitled to the taxes owns these tax certificates which have priority over mortgages and "any other obligation" for which the property is liable. KRS 134.420(3).

Tax certificates may be sold to a third-party. KRS 134.128(1). Between ninety and one-hundred-thirty-five days after these tax certificates are created, the clerk offers them for sale to third-party purchasers. KRS 134.128(2)(a)(2). Such a sale entitles the holder to recover, in addition to the amount of any unpaid taxes, all "interest, penalties, fees, commissions, charges, costs, attorney fees, and other expenses ... incurred by reason of delinquency ... or in the process of collecting any of them." KRS 134.420(3). The interest, fees, and penalties include: (1) a twelve percent annual interest,[2] (2) any advertising costs,[3] (3) a sheriff's commission,[4] and (4) a ten percent penalty for the delinquency.[5]

Third-party purchasers can collect on these tax certificates by negotiating with the delinquent taxpayer, or by filing a lawsuit to enforce the lien. KRS 134.546(2). However, they must wait one year after the taxes become delinquent before filing suit. *Id.*

A third-party purchaser who contemplates litigation is allowed additional fees from delinquent taxpayers. KRS 134.452. Before litigation actually commences, third-party purchasers may collect a "pre-litigation fee" of up to seven hundred dollars, depending upon the amount of taxes owed. KRS 134.452(1). Once litigation commences, third-party purchasers are also entitled to administrative costs and "actual, reasonable attorneys' fees and costs that arise due to the prosecution of

---

2. KRS 134.125.

3. KRS 134.119.

4. KRS 134.119(6).

5. KRS 134.015.

collection remedies or the protection of a certificate of delinquency that is involved in litigation." KRS 134.452(3)(a).

## B. Notice Provisions Under KRS Chapter 134

The statutory scheme for collecting taxes and selling tax certificates includes several notice provisions. The content of such notices varies somewhat, but in ways that are not germane to our review. It is sufficient to say that each of the notices alerts a party of potential financial jeopardy or alienation of their property rights as a consequence of the failure to pay a tax liability. Generally, the legislation was designed to provide actual notice to the owner listed in the PVA's office as the taxpayer, but only constructive notice to anyone else with an interest in the property, including any reversioners, remaindermen, or co-owners or mortgagees whose interest in the property would be of record in the county clerk's office.

The legislative scheme provides for a minimum of four actual notifications to the taxpayer identifiable in the records of the PVA. The first must be given "[w]ithin thirty (30) days after the establishment of a certificate of delinquency, the county attorney or the department shall mail a notice by regular mail to the owner of record...." KRS 134.504(4)(a). Others occur at various intervals or upon certain events until a foreclosure action is instituted. KRS 134.504(4)(d)1. ("[a]t least twenty (20) days after the mailing of the thirty (30) day notice...."); KRS 134.490(1)(a) ("[w]ithin fifty (50) days after the delivery of a certificate of delinquency by the clerk to a third-party purchaser...."); KRS 134.490(1)(b) ("[a]t least annually [after the 50–day notice and before litigation is commenced]...." KRS 134.490(1)(b)); KRS 134.490(2) ("[a]t least forty-five (45) days before instituting a legal action....").

No actual notice to anyone else with any interest in the property is required prior to the third-party purchaser's institution of foreclosure litigation. However, beginning in June 2013, persons with an interest in real property other than the listed taxpayer could check a website maintained by the Department setting forth "a consolidated list of certificates of delinquency by county, ... in alphabetical order by property owner name...." KRS 134.131(2). The Department takes the position that if the county sheriff's filing of tax liens with the county clerk does not constitute constructive notice to these other stakeholders, the website listing does.

## C. The Banks' challenge

Unsatisfied with this statutory scheme, the Banks filed suit for declaratory and injunctive relief in Franklin Circuit Court on November 5, 2010. The Banks are mortgage lenders who have security interests in various parcels of real property throughout the Commonwealth subject to *ad valorem* taxes. The Banks alleged the Department's sale of tax certificates to third-party purchasers violated several provisions of the Kentucky Constitution. They also argued the Department violated their due process rights by failing to provide mortgagees the same notice as taxpayers.

The Banks moved for summary judgment on June 9, 2011. In their motion, the Banks provided a wealth of evidence indicating the sale of tax certificates is a major industry in the Commonwealth. At the time of filing, seventy-seven registrants had notified the Department of Revenue of their intent to purchase tax certificates. Many of these registrants are out-of-state, for-profit businesses such as "Nebraska Alliance Company" of Omaha, Nebraska, and "Tax Ease Lien Investments 1, LLC" of Dallas, Texas.

The Banks also presented evidence that collection methods of these third-party purchasers were largely unregulated and the fees they charged during collection proceedings were disproportionate compared to the actual value of the tax certificates at issue. Specifically, the Banks pointed to several pending actions in which collection fees were almost equal to the amount of revenue that the government received by selling the tax certificates.[6] The Banks claimed those actions demonstrated how third-party purchasers routinely abuse debtors by levying excessive fees during collection proceedings in order to maximize their own profits.

The court held the Banks' motion in abeyance because several parties, including officials from Jefferson County, wished to intervene. On July 6, 2011, the circuit court allowed various Jefferson county officials, including the Sheriff, County Attorney, and County Clerk, to intervene as defendants in the suit. The Department filed a cross motion for summary judgment on August 2, 2011.

On November 29, 2012, the circuit court denied the Banks' summary judgment motion and granted that of the Department. In its order, the trial court expressed concern regarding the Banks' claims that the sale of tax certificates was susceptible to abuse. However, the court determined the legislation constitutional and that any policy concerns must be resolved by the General Assembly.

The Banks appealed. On appeal, the Banks raise the same constitutional challenges. These claims can be resolved by the application of law alone. We will address each claim separately.

6. Most notably, the Banks cited the case of *Kentucky Tax Bill Servicing, Inc. v. Patricia Lynn Cravens*, Franklin Circuit Court, Division II, Case No. 10–CI–01058, in which the

## II. Standard of Review

A motion for summary judgment must be granted if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56.03. "Because summary judgment involves only legal questions and the existence of any disputed material issues of fact, an appellate court need not defer to the trial court's decision and will review the issue *de novo.*" *Lewis v. B & R Corporation,* 56 S.W.3d 432, 436 (Ky.App. 2001) (footnote omitted).

When determining whether legislation is constitutional, the court's sole duty is to "lay the article of the constitution which is invoked beside the statute which is challenged and to decide whether the latter squares with the former." *Fiscal Court of Jefferson County. v. City of Louisville,* 559 S.W.2d 478, 481 (Ky.1977). We take care not to weigh the merits of legislative policy, and instead focus only on whether the legislation is "in accordance with or in contravention of the provision of the constitution." *Id.*

## III. Analysis

### A. Standing

Before we may consider the merits of the Banks' constitutional claims, we must consider whether they have standing to present them. Standing is "a party's right to make a legal claim or seek judicial enforcement of a duty or right." Black's Law Dictionary 1413 (7th ed. 1999). Our precedent defines standing as a "requirement that a party have a judicially recognizable interest in the subject matter of a

total amount claimed by a third-party purchaser was $16,183.56.00 while the government only received $8,248.00.

suit." *Harrison v. Leach,* 323 S.W.3d 702, 705 (Ky.2010). A party may have standing due either to statute or its relationship to an actionable controversy. *Tax Ease Lien Investments 1, LLC v. Commonwealth Bank & Trust,* 384 S.W.3d 141, 143 (Ky. 2012). But to have standing, Banks must demonstrate they have a "present or substantial" interest in the outcome, and not "a mere expectancy." *City of Ashland v. Ashland F.O.P. # 3, Inc.,* 888 S.W.2d 667, 668 (Ky.1994). We determine whether a party has standing based on the facts of each case. *Rose v. Council for Better Educ., Inc.,* 790 S.W.2d 186, 202 (Ky.1989).

The Department argues the sale of tax certificates to third-party purchasers does not implicate the Banks' judicially recognizable interests because the debts embodied in both the mortgage and the tax certificates remain personal to the taxpayer. See KRS 134.015(4). Because these debts remain personal, argues the Department, standing to challenge these debts—and the processes by which they are collected—lies with the delinquent taxpayer, not the mortgagee.

But the Department concedes that mortgagees have standing to challenge third-party purchasers' fees during foreclosure proceedings. *See Tax Ease,* 384 S.W.3d at 143. In *Tax Ease,* a third-party purchased a tax certificate and instituted foreclosure proceedings against the property owner to recover the certificate's value. *Id.* The third-party purchaser and property owner entered into an Agreed Judgment awarding the third-party purchaser the value of the tax certificate as well as "reasonable attorney fees." *Id.* Commonwealth Bank, a mortgagee of the property, moved to vacate the Agreed Judgment, challenging the amount of attorney fees specified by the judgment as unreasonable. *Id.*

The Supreme Court determined Commonwealth Bank had standing to challenge the attorney fees specified by the Agreed Judgment. Because the third-party purchaser's claim had priority over Commonwealth Bank's mortgage interest, the Court reasoned that the additional attorney's fees increased the amount of money owed to the third-party purchaser, and "consequently impaired the value of Commonwealth Bank's mortgage interest." *Id.* Thus the "reduction of the [bank's] security interest in the property [was] an injury that merit[ed] its right to participate in the [suit]." *Id.*

In the case at bar, the Banks have standing to challenge the sale of tax certificates to third-party purchasers. As mortgagees, the Banks have interests in these parcels of real property, notwithstanding that the interests are subordinate to the liens memorialized by the tax certificates.

KRS Chapter 134 permits the sale of tax certificates to third-party purchasers who charge additional fees, and redeem those fees through foreclosure proceedings. During a foreclosure sale, third-party purchasers have priority and receive proceeds from the sale of the property before the Banks may recover any of the value of their interests. Accordingly, a foreclosure sale to recoup what the third party paid for the tax certificates and associated costs of collection reduces the amount of money available to a mortgagee to satisfy its interest. This impinges upon the rights of the mortgagee by reducing the mortgagee's security interest. This reduction in value, as in *Tax Ease,* merits the Banks' right to participate in this suit. The Banks have standing; we now consider the merits of their arguments.

**B. Merits**

The Banks argue that KRS Chapter 134 violates several provisions of the Kentucky Constitution. Their arguments stem from

a common premise: the sale of tax certificates to third-party purchasers constitutes an illegal delegation of the Commonwealth's sovereign authority to levy and collect taxes. The Banks claim this delegation of authority to third-party purchasers—who are allowed to charge additional fees—subjects some delinquent taxpayers to an abusive, non-uniform system of tax collection that violates several provisions of the Kentucky Constitution.

### 1. Kentucky's Constitution does not explicitly prohibit the sale of tax certificates.

The Banks argue that the plain language of Kentucky Constitution § 181 and § 175 prohibits the sale of tax certificates to third-party purchasers. The text of § 181 of the Kentucky Constitution states in part:

> The General Assembly shall not impose taxes for the purposes of any county, city, town or other municipal corporation, but may, by general laws, confer on the proper authorities thereof, respectively, the power to assess and collect such taxes.

Ky. Const. § 181. Section 175 holds simply that "[t]he power to tax property shall not be surrendered or suspended by any contract or grant to which the Commonwealth shall be a party." Ky. Const. § 175.

But the Banks' premise is flawed; the sale of tax certificates to third-party purchasers is neither a delegation, nor a surrender of the Commonwealth's authority to impose or collect taxes. Instead, the sale of tax certificates allows third-party purchasers to satisfy outstanding tax debts in exchange for a "chose in action" to recover the cost of the tax certificates and all attendant fees. A chose in action is a right of action to recover "a debt, a demand, a promissory note, [or] a

right to recover damages." *Sheldon v. Sill*, 49 U.S. 441, 447, 8 How. 441, 12 L.Ed. 1147 (1850). Kentucky law has long recognized a party's ability to purchase, and transfer choses in action, even for delinquent tax claims. *See Iowa Valve Co. v. Merkle Contracting Co.*, 258 Ky. 444, 80 S.W.2d 557, 558 (1935). And it is equally well-settled that choses in action do not include any rights that may not be assigned. *Wittenauer v. Kaelin*, 228 Ky. 679, 15 S.W.2d 461, 462 (1929). By purchasing tax certificates, third-party purchasers act no differently than the delinquent taxpayer, because, like the taxpayer, third-party purchasers satisfy all outstanding tax debts, fees, and interest. In exchange, they receive the right to recompense by enforcing the rights obtained by acquiring the chose in action. Similarly, the mortgagee who pays the tax in accordance with the statutory scheme is entitled to recover that amount from the taxpayer.

The right to levy and collect taxes may not be assigned by means of the chose in action and it is not so assigned here. The right to recompense afforded by KRS Chapter 134 is very different from the authority to levy or collect taxes for two important reasons. First, these assigned choses in action do not include the right to levy taxes. Third-party purchasers cannot charge additional taxes, nor change the rates by which properties are taxed. Those taxes are assessed by the county PVA pursuant to KRS 132.220(4), not the third-party purchaser. Instead, the statute authorizes third-party purchasers to recover the amount they paid for the tax certificates, plus any costs generated during collection proceedings.

Second, the choses in action do not imbue third-party purchasers with the power to collect taxes because the taxpayer's underlying tax debts have already been satisfied by the third-party's purchase. More-

over, after third-parties purchase these certificates, they are under no obligation to remit any money they collect back to the Commonwealth. In practice, third-party purchasers more closely resemble taxpayers than tax collectors because they stand in the shoes of the taxpayer at the moment they extinguish the taxpayer's tax liability. Arguing that a third-party purchaser assumes the role of government to collect a tax that has already been satisfied is illogical. The government, having received what the taxpayer owes it, no longer has any right against the taxpayer whose duty and debt to the government on this count has been satisfied. These circumstances distinguish the sale of tax certificates from the unconstitutional sale of licenses to act as tax collectors.

*2. Variability of collection fees does not make the collection of taxes non-uniform.*

■ The Banks also argue that by allowing third-party purchasers to charge additional fees, such as "pre-litigation fees," KRS Chapter 134 violates Kentucky Constitution § 171. Section 171 provides, in part:

> Taxes shall be levied and collected for public purposes only and shall be uniform upon all property of the same class subject to taxation within the territorial limits of the authority levying the tax; and all taxes shall be levied and collected by general laws.

Ky. Const. § 171.

Because collection methods, and the amount of fees, vary among third-party purchasers, the Banks argue that these vagaries violate the mandate of Section 171 that all taxes be "uniform" and "collected by general laws." But again, the Banks' argument fails, this time because they conflate taxes with collection fees; while the former must be uniform, § 171 is silent as to the latter.

■ Courts, too, have struggled with the distinction between "taxes" and regulatory "fees." *See San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n of Puerto Rico,* 967 F.2d 683, 685 (1st Cir.1992). On the one hand, a tax: (1) is imposed by a legislature upon most, if not all citizens, (2) raises revenue for the general fund, and (3) is spent for the benefit of the entire community. *See, e.g., National Cable Television Ass'n. v. United States,* 415 U.S. 336, 340–41, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974). A fee on the other hand may serve a governmental purpose by imposing additional costs on certain actors and thus, discouraging conduct by making it more expensive. *See, e.g., South Carolina ex rel. Tindal v. Block,* 717 F.2d 874, 887 (4th Cir.1983), *cert. denied,* 465 U.S. 1080, 104 S.Ct. 1444, 79 L.Ed.2d 764 (1984) (citing *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942)). A fee also may be imposed to indirectly further a regulatory objective, such as defraying expenses of a service. *See, e.g., Union Pacific R.R. Co. v. Pub. Util. Comm'n,* 899 F.2d 854, 856 (9th Cir.1990).

More than occasionally, the government's imposition of a financial burden on a citizen possesses attributes of both a tax and a fee. Analyzing courts must determine that hybrid's proper place along a continuum that has as its extremes what is clearly a tax and what is clearly a fee. Ultimately, the analysis focuses on whether the revenue generated by the payment will provide a "general benefit to the public, often financed by a general tax, or whether it provides more narrow benefits to regulated companies or defrays the [government's] costs of regulation." *San Juan Cellular Tel. Co.,* 967 F.2d at 685. Our precedent closely tracks the analysis of the federal courts. *See Long Run Bap-*

tist Ass'n, Inc. v. Louisville & Jefferson Cnty. Metro. Sewer Dist., 775 S.W.2d 520, 521 (Ky.App.1989) ("A tax is universally defined as an enforced contribution to provide for the support of government, whereas a fee is a charge for a particular service."); Renfro Valley Folks, Inc. v. City of Mt. Vernon, 872 S.W.2d 472, 474 (Ky.App. 1993) (taxes are used to raise general revenue without regard to direct benefits to the parties or property taxed).

Applying that analysis here, we see that the additional costs charged by the third-party purchaser are fees, not taxes. They are claimed and collected by a private entity and only to the extent authorized by the General Assembly. The General Assembly permits third-party purchasers to impose fees only as to individual delinquent taxpayers. The fact that, collectively, they form a distinct group of citizens— delinquent taxpayers—does not support the assertion that the fees are assessed upon the citizenry.

Three purposes are served by this legislative scheme of allowing collection of fees. First, allowing third-party purchasers to charge additional fees increases the overall cost of tax noncompliance, and thus discourages, in theory at least, long-term tax delinquency. Second, allowing third-party purchasers to recoup additional fees furthers the Commonwealth's regulatory interest in ensuring tax compliance by providing incentive for parties to purchase tax certificates. Third, selling tax certificates to private parties allows the Commonwealth to avoid the costs incurred during collection proceedings.

When focusing on the central question of whether the revenue obtained by a third-party purchaser benefits the general public, we are persuaded that it does not. Accordingly, the payments charged by third-party purchasers are fees, not taxes; the variance among third-party purchasers as to the amount of fees and the manner by which they are collected does not offend Kentucky Constitution § 171.

### 3. Variability of collection fees does not make this legislative scheme arbitrary.

██ The Banks also assert that this variance in fees charged by third-party purchasers demonstrates that, as applied, KRS Chapter 134 is unconstitutionally arbitrary. They claim the sale of tax certificates to third-party purchasers is unconstitutional because it bears no "rational relationship to a legitimate state end." D.F. v. Codell, 127 S.W.3d 571, 575 (Ky. 2004).

Keeping the preceding analysis in mind, we need not pause long before responding to this assertion because the sale of tax certificates to third-parties does not alter the rates by which properties are taxed; rather, the statutory scheme permits third-party purchasers to charge additional fees to recover certain related expenditures and those fees certainly will vary. Moreover, we are hard-pressed to see how our General Assembly acted irrationally by granting third-party purchasers access to additional fees. Given the state's fundamental interest in collecting taxes, Talbott v. Burke, 287 Ky. 187, 152 S.W.2d 586, 587 (1941), there is a rational basis for providing financial incentives to purchase tax certificates. Further, the General Assembly explicitly stated this rationale in KRS 134.452(5).

### 4. Sale and third-party collection of tax certificates does not constitute a taking.

██ The Banks' final ground for challenging the constitutionality of KRS Chapter 134 also misses the mark. They allege the sale of tax certificates to third-party purchasers constitutes a taking because such sales transfer the Commonwealth's

coercive authority to generate private profits. According to the Banks, this practice violates § 13 and § 242 of the Kentucky Constitution as well as the Fifth Amendment to the United States Constitution. Because money is personal property, the Banks argue, it logically follows that when the Commonwealth "takes" it—or in this case allows third-parties to "take" it—the Commonwealth must provide just compensation. We are not persuaded by this argument.

The Banks correctly note the thrust of these constitutional provisions is that the government may not take a citizen's private property without providing just compensation. The argument fails, however, because it relies on incomplete and inconsistent readings of both the United States and Kentucky Constitutions. True, the difference between taxes and takings is hazy and intellectually unsatisfying. *See generally* John E. Fee, *The Takings Clause as a Comparative Right,* 76 S. Cal. L.Rev. 1003 (2003). But the United States Supreme Court has long recognized a government's power to tax does not equate to a *per se* taking under the Fifth Amendment. *Brushaber v. Union Pac. R. Co.,* 240 U.S. 1, 24, 36 S.Ct. 236, 244, 60 L.Ed. 493 (1916).

In *Brushaber,* a taxpayer challenged Congressional authority to levy an income tax on the ground that it violated the Fifth Amendment. The Supreme Court recognized that accepting the taxpayer's argument would lead to an absurd result: that the government may not "take" tax monies without providing just compensation. In rejecting the taxpayer's argument, the *Brushaber* Court stated that:

> So far as the due process clause of the 5th Amendment is relied upon, it suffices to say that there is no basis for such reliance, since it is equally well settled that such clause is not a limitation upon the taxing power conferred upon Congress by the Constitution; in other words, that the Constitution does not conflict with itself by conferring, upon the one hand, a taxing power, and taking the same power away, on the other, by the limitations of the due process clause.

*Id.*

Likewise, we find the *Brushaber* Court's analysis persuasive in interpreting Kentucky Constitutional provisions. The Kentucky Constitution, like its federal counterpart, contains provisions both allowing the legislature to tax, and prohibiting government takings. *Compare* U.S. Const. art. I, § 8, cl. 1 (authorizing Congress to collect taxes) and U.S. Const. amend. V. (prohibiting takings without just compensation) *with* Ky. Const. §§ 169–182 (governing revenue and taxation) and Ky. Const. §§ 13 (prohibiting takings). Of course, our General Assembly has the power to levy and collect taxes without offending either the Federal or State Constitution. Moreover, our precedent has long rejected the idea that tax sales—and by necessity, the statutory processes that govern those sales—constitute illegal takings. *See Richardson v. Brunner,* 356 S.W.2d 252, 254 (Ky.1962). Therefore, we hold that the statutory provisions set forth in KRS Chapter 134 do not constitute a taking under either the United States Constitution or the Kentucky Constitution.

5. *Notification under the legislative scheme satisfies due process requirements.*

■ The Banks also claim notice provisions in KRS Chapter 134 are insufficient to guarantee mortgagees due process under the 14th Amendment to the United States Constitution. They argue that, like taxpayers, mortgagees should receive actual notice both when taxes become delin-

quent, and when tax certificates are sold to third-party purchasers. While we agree that a mortgagee's interest in real property subject to *ad valorem* taxes is jeopardized when tax payment is delinquent, we do not agree that mortgagees are deprived of the process they are due under the legislature's statutory scheme for the collection of delinquent taxes.

In fairness, we begin by reminding ourselves that " 'a mortgage is simply a deed containing a clause of defeasance and no particular form of defeasance is required.' " *Hart v. Hill*, 305 Ky. 216, 203 S.W.2d 13, 16 (1947) (quoting *Talley v. Eastland*, 259 Ky. 241, 82 S.W.2d 368, 371 (1935)). The defeasibility of the mortgagee's interest does not alter the fact that just as a taxpayer's deed represents his ownership interest in a parcel of real property, so too does a mortgage represent the mortgagee's ownership interest, such as it is, in that parcel of land.

Before that interest, or any property interest, can be taken from its owner, due process requires that the government provide adequate procedural safeguards. Such due processes ensure property interests are not unjustly or unfairly impaired. Generally, due process includes

some form of notice and an opportunity to be heard. *Armstrong v. Manzo*, 380 U.S. 545,552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). We do not dispute the Banks' contention that mortgagees have sufficient property interests to warrant some procedural safeguards. The question is, as always, "What process is due?"

"[U]nlike some legal rules, [due process] is not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). Because of its amorphous nature, due process must be applied flexibly as "the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

In a case well known to every first-year law student, *Mullane v. Central Hanover Bank & Trust Co.*, the United States Supreme Court said courts must assess due process by determining "whether notice [is] reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action [7] and afford them an opportunity to present their objections." 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950).

---

**7.** We note that the word "action" as used here describes "any proceeding which is to be accorded finality[.]" *Mullane*, 339 U.S. at 314, 70 S.Ct. 652. The Court was obviously referring to judicial proceedings in which a court of law enters judgment; this is clear from the language of *Mullane* and the cases it cites in support of the proposition. *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940) (whether "substituted service [of the filing of a lawsuit] may be wholly adequate to meet the requirements of due process"); *Grannis v. Ordean*, 234 U.S. 385, 391, 34 S.Ct. 779, 58 L.Ed. 1363 (1914) (whether "service by the publication and mailing of a summons in the partition suit ... constituted due process of law"); *Priest v. Board of Trustees of Town of Las Vegas*, 232

U.S. 604, 610, 34 S.Ct. 443, 58 L.Ed. 751 (1914) (whether "all of the defendants were brought before the court by proper process"); *Roller v. Holly*, 176 U.S. 398, 402, 20 S.Ct. 410, 44 L.Ed. 520 (1900) ("whether a notice served upon the plaintiff ... to answer the foreclosure suit is due process of law within the meaning of the Fourteenth Amendment"). The Banks claim due process entitlement to actual notification of certain "acts" by the government taxing authority—declarations of tax delinquencies and the sales of tax certificates—and not notification of an "action" as that term is used in *Mullane*. These "acts" are not "accorded finality" in a way that affects ownership of the real property in which the mortgagees have an interest.

Our legislature was careful to include in the statutory scheme multiple notifications to the taxpayer listed with the PVA. The Banks assert that due process demands they have the same actual notice. The linchpin of the Bank's argument is another United States Supreme Court case that applies *Mullane* to the collection of *ad valorem* taxes under Indiana law, *Mennonite Board of Missions v. Adams*, 462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983).

The reason we are not persuaded by *Mennonite* is revealed by the first sentence of the opinion: "This appeal raises the question whether notice by publication and posting provides a mortgagee of real property with adequate notice of a *proceeding to sell the mortgaged property for nonpayment of taxes.*" *Id.* at 792, 103 S.Ct. 2706 (emphasis added). We would not, and do not, allow alienation of the mortgaged real property without actual notice to the mortgagee. KRS 426.006. Indiana's law did.

As the Supreme Court said:

Indiana law provides for the annual sale of real property on which payments of property taxes have been delinquent for fifteen months or longer. Prior to the sale, the county auditor must post notice in the county courthouse and publish notice once each week for three consecutive weeks. The owner of the property is entitled to notice by certified mail to his last known address.... [H]owever, Indiana law did not provide for notice by mail or personal service to mortgagees of property that was to be sold for nonpayment of taxes.

*Id.* at 792–93, 103 S.Ct. 2706 (citations and footnotes omitted). Indiana's system allowed the alienation of the mortgaged property without actual notice to the mortgagee and the Supreme Court held this violated constitutional due process. That is not how Kentucky's statutory scheme works.

Under Kentucky law, there is no alienation of the property from the taxpayer without notice to the mortgagee and the opportunity to be heard during the foreclosure proceeding. KRS 426.006. In fact, the third-party purchaser's efforts to obtain reimbursement from the taxpayer for having satisfied his tax burden might well succeed before any foreclosure suit is ever filed. In such event, the mortgagee's interest remains entirely unaffected.

The Banks' reference to *City of Louisville v. Miller*, 697 S.W.2d 164 (Ky.App. 1985) also misses the mark. When this Court applied *Mennonite* in that case to the Mass Foreclosure Act, KRS 91.450–91.527, we first examined the notice provision. It required " 'notice of the filing of the [foreclosure] suit to any taxing authority or person of record owning or holding any tax bills or claiming any right, title, or interest in or to, or lien upon, any such parcel of real estate as set out in the petition....' " *Miller*, 697 S.W.2d at 166 (quoting KRS 91.4884). We concluded that part of the statute "complies with the minimum constitutional safeguards set forth ... in *Mennonite* ... and *Mullane....*" *Id.* at 166. What we found unconstitutional was statutory language stating "failure of the collector to mail the notice ... shall not affect the validity of any proceedings" because it "effectively nullifies" the notice provision just found constitutional. *Id.*

▆ These applications—*Mennonite* and *Miller*—involve tax sales. A tax sale is the sale of the taxpayer's property to satisfy the taxpayer's liability to the taxing authority. What we have before us is not the sale of the taxpayer's property, but the assignment of the taxing authority's property—a chose in action—*i.e.*, the right to

pursue recovery of the third-party purchaser's satisfaction of the taxpayer's liability to the taxing authority. When such pursuit results in a foreclosure action, as it did in *Miller*, due process requires actual notice to the mortgagees, but not before.

If the facts now before us mirrored those of *Mennonite*—*i.e.,* the mortgaged property itself was being sold to pay delinquent taxes without actual notice to mortgagees—we would not have the slightest hesitation applying *Mennonite* and *Mullane* to grant the relief the Banks request. The Banks, however, want more process than notification of the imminent alienation of the real property and total elimination of their security interest which is what *Mennonite* requires. The Banks want actual notification of the assignment of the right to reimbursement for a third-party's payment of their mortgagor's tax liability. We do not believe due process requires it.

The fact is that even before the third-party purchaser process is underway, mortgagees are allowed to pay the delinquent taxes on property subject to their mortgage. That eliminates the third-party-purchaser procedure entirely as to the subject property, and allows the mortgagee the same rights heretofore discussed as benefitting third-party purchasers. The Banks are free to undertake the same diligent effort as potential third-party purchasers to monitor the tax delinquencies of real property holders. Whereas third-party purchasers are *generally* interested in doing so, mortgagees have *specific* interests in *specific* properties. The choice not to monitor the delinquency status of their mortgaged property is a business decision.

We also acknowledge that determining mortgagees of record is not a particularly burdensome task that the legislature might have required of the Department. However, that is a legislative prerogative which we have no authority to compel.

For these reasons, we believe the constructive notice provided by the Department in accordance with the legislative scheme for selling tax certificates does not offend the due process clauses of the United States Constitution.

### Conclusion

For the foregoing reasons, we conclude that neither the statutory scheme for selling tax certificates to third-party purchasers nor the notice afforded mortgagees under the applicable statutes is constitutionally defective. Accordingly, we affirm the Franklin Circuit Court's November 29, 2012 order and judgment.

ALL CONCUR.