NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0287n.06

No. 18-5909

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | |
|---|---|
| JAMES BROWN; PHILIP LEIGH; DENISE PUCKETT, Executrix of Theresa Cambron, on behalf of themselves and all others similarly situated; LAURA BRANSON; THIRD CENTURY DEVELOPMENT CORPORATION,<br><br>    Plaintiffs-Appellants,<br><br>v.<br><br>TAX EASE LIEN SERVICING, LLC; TAX EASE LIEN INVESTMENTS 1, LLC; BLUE GRASS ABSTRACT, LLC; LIEN DATA SERVICES, LLC; PHIL MIGICOVSKY; RICHARD ERIC CRAIG; SHERROW, SUTHERLAND & ASSOCIATES, PSC; BILLY W. SHERROW; TAX EASE HOLDINGS, LLC, fka Tax Ease L.P.; TAX EASE FUNDING TWO, LLC; BLUESHINE, LLC; TREY GULLEDGE,<br><br>    Defendants-Appellees. | **FILED**<br>Jun 04, 2019<br>DEBORAH S. HUNT, Clerk<br><br><br>ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY |

Before: SUHRHEINRICH, THAPAR, and LARSEN, Circuit Judges.

LARSEN, Circuit Judge. To combat the effect of property-tax delinquencies on government coffers, the Kentucky General Assembly enacted a system in which long-delinquent tax bills, represented by certificates of delinquency, may be sold to third-party purchasers. The government gets its money, and the third-party purchasers collect on the certificates, which function as liens on the subject properties. The purchasers are entitled by statute to collect the amount paid for the certificates plus interest, prelitigation attorney's fees, attorney's fees

associated with litigation, and administrative fees. Defendants (Tax Ease)[1] have profited from this process. Plaintiffs, tax-delinquent property owners who are members of this putative class action, contend that Tax Ease has committed fraud by assessing fabricated and unreasonable attorney's fees and costs in connection with its collection efforts. The district court granted summary judgment to Tax Ease, concluding that plaintiffs had failed to produce evidence from which a jury could conclude that the fees charged were fictitious or unreasonable. For the reasons stated below, we AFFIRM the award of summary judgment. Plaintiffs also challenge the district court's implicit denial of its motion for expert witness fees pursuant to Federal Rule of Civil Procedure 26(b)(4)(E). Because the district court did not explain its reasons for denying plaintiffs' motion, we REVERSE the implicit denial of that motion and REMAND for further proceedings limited only to that issue.

I.

Kentucky has created a "statutory framework for collecting *ad valorem* taxes owed to the Commonwealth, its counties, and their respective tax districts." *Farmers Nat'l Bank v. Commonwealth, Dep't of Revenue*, 486 S.W.3d 872, 875 (Ky. Ct. App. 2015). "*Ad valorem* taxes provide revenue for Kentucky schools, and other essential public services." *Id.* But whenever there are taxes, some will fail to pay. As the Kentucky Court of Appeals has recognized:

> [T]ax delinquency impairs our government's ability to maintain a consistent stream of tax revenue, and thus frustrates its ability to fund its endeavors. To combat tax delinquency, our General Assembly enacted legislation permitting the sale of long-delinquent tax bills, known as 'certificates of delinquency' (tax certificates) to private, third-party purchasers. Third-party purchasers buy these tax certificates, and in doing so, satisfy the tax debt. In exchange, third-party purchasers may recoup the costs of tax certificates as well as additional fees generated during collection proceedings.

---

[1] We refer to defendants collectively as "Tax Ease." All the Tax Ease entities involved in this case are owned by two holding companies, Tax Ease Holdings and Tax Ease Funding.

*Id.* In 2005, the Kentucky Court of Appeals held that third-party purchasers had a right to recover attorney's fees in enforcing certificates of delinquency. *Flag Drilling Co., Inc. v. Erco, Inc.*, 156 S.W.3d 762, 767 (Ky. Ct. App. 2005). This prompted the Kentucky General Assembly to revise the tax-delinquency process in 2007. The 2007 amendments, which govern this case, allowed a third-party purchaser to collect from the property owner (1) the amount of the certificate; (2) interest accrued; (3) prelitigation attorney's fees, never to exceed $700 for a single certificate; (4) attorney's fees and costs arising from litigation; and (5) administrative fees. *See* Ky. Rev. Stat. § 134.452.

Plaintiffs are individuals and companies who failed to pay their property taxes. Tax Ease Lien Investments 1 (TELI) and Tax Ease Lien Servicing (TELS) purchased the certificates of delinquency for all plaintiffs' outstanding tax bills.[2] Once TELI and TELS purchased the certificates, they were required by law to send a fifty-day notice—a letter advising the property owner that the certificate constitutes a lien of record against the property, bears interest at a prescribed rate and, if not paid, is "subject to collection as provided by law." Ky. Rev. Stat. § 134.490(1), (3)(d). For one year after purchasing the certificate, the law limited TELI and TELS to prelitigation collection efforts; they could not institute an action to collect on the certificate or enforce the lien. *Id.* at § 134.490(2).

At the start of its Kentucky operations, Tax Ease worked with an attorney, Virginia Lawson, who helped prepare and send the fifty-day notices to property owners. But Tax Ease had little success collecting on certificates. Tax Ease believed it could increase its collection rate by sending more frequent letters. Tax Ease employee William Abshier explained,

---

[2] Plaintiffs also sued Blueshine, another Tax Ease-owned third-party purchaser. But there is no evidence that Blueshine purchased any of the certificates for plaintiffs' outstanding tax bills.

> [W]e were going to start sending more frequent letters, so if they took, say, a full two years to pay and received, say, eight letters during that time frame to the full maximum prelitigation fee amount, they were going to be paying more because of their inaction.

> But the trade-off for that was that . . . we were going to be consistently trying to find . . . the true property owner that owed us the money and letting them know they owed us the money rather than just sitting there until it was time to foreclose.

According to Abshier, "[A]s you would expect, if you get an additional notice letter, you're more likely to pay off than your peers that had received no letter" in the time since the initial fifty-day notice. Eventually, Tax Ease decided that it was best to send "progressively more aggressive" letters leading up to foreclosure, to remind the property owners that foreclosure was imminent.

Impediments to collection remained, however, including a lack of current information on the property owners. Tax Ease attempted to solve that problem by creating Lien Data Services (LDS), a company that would gather information and offer administrative services to attorneys representing Tax Ease in the prelitigation process. Abshier explained:

> So we knew that we needed to go back and update these mailing addresses for everyone. And we thought that would be the service that we could sell to the attorney. Say, hey, look, we're going to ask you to send letters, we're going to ask you to send them to these updated mailing addresses, and we think we've got the vendor management system to handle getting those updates for you. And that was the business plan.

Lawson declined to continue working with Tax Ease after the creation of LDS, so Tax Ease retained Billy Sherrow and his law firm, Sherrow, Sutherland and Associates, to handle the notices and represent TELI and TELS in the prelitigation phase of enforcing the certificates of delinquency. Sherrow would use LDS's services to locate mailing addresses and send the notices to property owners on his letterhead. Initially, Tax Ease paid Sherrow $67.50 per notice, although the price went up over time. Sherrow would then pay LDS $62.50 for its work, leaving Sherrow with $5 per notice. Tax Ease would then charge the property owners the amount it paid Sherrow

as prelitigation fees. According to plaintiffs, Sherrow sent over 200,000 notices to property owners on behalf of Tax Ease during the approximately seven years they worked together. Plaintiffs in this case were each charged at or around the statutory prelitigation fee maximum for multiple notices sent by Sherrow on Tax Ease's behalf.

Tax Ease eventually identified an additional source of revenue. During the foreclosure process, attorneys would often farm out title searches to third parties because there were not enough attorneys to handle the work. So Tax Ease created a title company, Blue Grass Abstract (BGA), to assist. BGA would do the title work for the foreclosing attorneys, such as Sherrow and Eric Craig, who would then pass on the cost to Tax Ease. Tax Ease would pay the attorneys and then bill the property owners in the form of litigation fees. Tax Ease charged all the named plaintiffs either $300 or $400 for BGA's role in the process.

Litigation between plaintiffs and Tax Ease began in state court. After years of messy procedural maneuvering, this case arrived in federal court, styled as a putative class action against Tax Ease. Plaintiffs raised many claims, all premised on the idea that Tax Ease had created a fraudulent scheme to charge the property owners fictitious and unreasonable fees. Among other claims, plaintiffs asserted violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*, and the Kentucky Consumer Protection Act, Ky. Rev. Stat. § 367.110 *et seq.*, as well as common law claims for unjust enrichment, fraud, and fraud in the inducement. Plaintiffs focused on two sets of fees: (1) prelitigation fees for the work done by Sherrow and LDS in relation to the notices sent to property owners; and (2) fees and costs related to the title-report work done by BGA.

Tax Ease moved for summary judgment. Tax Ease argued that "[w]hile the specific elements of Plaintiffs' causes of action differ, each is premised on the allegation that any fees

attributable to vendors such as LDS and BGA are not real fees." Because the fees charged were actually incurred and reasonable, said Tax Ease, plaintiffs' claims failed. The district court agreed with Tax Ease that all fees were "actual and reasonable"; granted summary judgment to Tax Ease on all claims; and dismissed the action. *Brown v. Tax Ease Lien Servicing, LLC*, No. 3:15CV-208-CRS, 2018 WL 1573231, at *13 (W.D. Ky. Mar. 30, 2018). Plaintiffs then filed a motion to alter or amend the judgment, arguing that the district court had overlooked evidence, including expert witness evidence, and that the court had failed to rule on their motion to compel Tax Ease to pay expert witness fees pursuant to Rule 26(b)(4)(E). The district court denied the motion. The court explained that, while plaintiffs had mustered some facts "in support of their contention that the defendants' business practices constituted fraud and racketeering[,] . . . those facts, taken in the light most favorable to plaintiffs, were not *material* facts inasmuch as they did not controvert the defendants' evidence." As to plaintiffs' expert testimony, the court noted that plaintiffs had proffered that evidence too late. The court did not address plaintiffs' motion for expert witness fees.

## II.

Plaintiffs are not now raising, and indeed cannot raise, individual challenges to the amounts of the attorney's fees assessed against them. The district court recognized that while "[t]he named plaintiffs in this action have each articulated some discrepancy in the fees added to their tax bills, that bogus title report fees were added, or . . . that the prelitigation attorneys' fees exceeded the statutory maximum allowed," nevertheless "[a]ll of the plaintiffs knowingly and voluntarily resolved their tax delinquency in some fashion." *Brown*, 2018 WL 1573231, at *13. The district court appropriately concluded that plaintiffs are "bound by their judgments, absent a successful claim for fraud or misrepresentation upon which they relied in settling their claims." *Id.* It is,

therefore, plaintiffs' burden in this case to show that the fees were not actual and reasonable—i.e., that they were fraudulent.

By seeking summary judgment, Tax Ease assumed the burden of showing that no genuine issues of material fact existed and that it was entitled to judgment as a matter of law. *Hanrahan v. Mohr*, 905 F.3d 947, 953–54 (6th Cir. 2018). To escape summary judgment, plaintiffs "must set forth specific facts showing that there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). We review de novo the district court's award of summary judgment to Tax Ease. *Audi AG v. D'Amato*, 469 F.3d 534, 542 (6th Cir. 2006).

A.

We begin with plaintiffs' challenge to the prelitigation fees. The 2007 amendments allow a third-party purchaser to collect "[a]ttorneys' fees incurred for collection efforts prior to litigation." 2007 Ky. Laws ch. 14 (HB 321), § 1(c)(1), *codified at* Ky. Rev. Stat. § 134.452(1)(c)(1).[3] Those fees must be actual and reasonable and are capped by statute. Fees vary with the amount of the certificate, but they may never exceed $700 for collection efforts related to a single certificate. Ky. Rev. Stat. § 134.452(1)(c)(2). The General Assembly did not define "prelitigation attorneys' fees" in the 2007 amendments; but later amendments state that "[p]relitigation attorneys' fees . . . may include amounts incurred for collection efforts and costs related to notification, processing, research, communication, compliance, legal costs, documentation, and similar expenses." *Id.* at § 134.452(1)(c)(1). Plaintiffs do not argue that fees for sending prelitigation notices would be uncollectible under the 2007 version of the statute.

The district court made two important observations, which plaintiffs do not contest. First, that "it is neither unusual nor impermissible for attorneys to outsource work to legal and nonlegal

---

[3] All statutory references are to the 2007 version unless otherwise stated.

staff so long as the attorney remains ultimately responsible for rendering competent legal services." *Brown*, 2018 WL 1573231, at *5. And second, that "[t]here is nothing illegal or improper about the fact that the third-party purchasers, TELS, and TELI, and the vendors, LDS and BGA, are owned by [the same] holding company." *Id.* With these principles in mind, we consider whether genuine issues of material fact remain regarding the prelitigation fees.

Ample evidence in the record shows that LDS provided valuable services to attorneys. Catherine Abshier explained the problems Tax Ease had in identifying property owners prior to the creation of LDS:

> [I]n speaking with local [Property Valuation Administrator (PVA)] offices, what we began to understand is that in some of the smaller counties in the state of Kentucky where their systems are not necessarily online, the PVA office solidifies their tax role, generally, as of January 1st of each taxable year. And so if the property transfers or is sold in any way . . . during the year, the PVA office does not capture that update until January of the following year. . . .
>
> And so, frequently, if the property address was, in fact, the mailing address, the new owner would receive the bill in the name of the previous owner and disregard it, not understanding that it is their responsibility. And also frequently the address that was on the property tax bill was not the property address but the mailing address. So the bill may never have been received by the current homeowner.

Abshier did not know whether Lawson, the first attorney handling the notices, had attempted to receive updates from county PVAs prior to sending notices, "but the low redemption rates that we had may indicate that that wasn't happening." Abshier continued, "[O]nce we implemented a process through LDS, when it worked properly, we had . . . contractors on the ground that . . . would obtain the correct owner and mailing address for each delinquent tax bill. And when those . . . PVA updates were done properly, redemptions improved."

Trey Gulledge, an executive at Tax Ease, testified that Tax Ease, through LDS, wanted to take nonlegal services away from the attorneys so they could work on reviewing the work product and dealing with the follow-up:

> [I]t doesn't make sense for me in my mind as a business person to think of Billy Sherrow trying to find somebody in Perry County to go into the PVA office and pull however many PVA cards and to match the PVA card to the certificate of delinquency and make sure those match and to find the right contractor and make sure they show up for work and then review their work product and then find a mail house and negotiate the best price for the mail house and negotiate a price for the contractor.
>
> I mean, there's a whole host of things that are more business oriented and logistical and not so much legal. So a big part of LDS's business plan was to take that off the plate of the attorney to handle things that were nonlegal in nature and to have the attorney review the work product to make sure it met their satisfaction and to do the follow-up with the questions that came through.

Based on the record evidence, there is thus little doubt that LDS offered a real service to the lawyers. But did the arrangement between Tax Ease, Sherrow, and LDS lead to fraudulent or unreasonable fees? Again, Tax Ease would initially pay Sherrow $67.50 per notice. Sherrow would then pay LDS $62.50 for its work, leaving Sherrow with $5 per notice. Tax Ease would then charge the property owners the amount it paid Sherrow as prelitigation fees. Over time, the prices crept up, but the arrangement remained the same.

The sticking point, according to plaintiffs, is Sherrow's involvement, or his lack thereof. Sherrow offered this general overview of his role in the process:

> [T]he vendor was going to handle all of the data management of sending the letters, get the information together, checking with the PVA, getting all of the information from the PVA, getting the information on the property map numbers . . . . They were going to manage that. . . .
>
> We [the firm] were going to represent the client in the sense that we reviewed the applicable laws, first of all, determined the necessary content of the letters, what the law required in terms of those notices, the information that had to be in the letter, and then I actually drafted letters . . . and presented them to Tax Ease for their review.

Plaintiffs paint Sherrow as a shell, whose only purpose was to allow Tax Ease to funnel money to itself through other entities. Because of this, plaintiffs claim that the prelitigation fees cannot be actual or reasonable.

Specifically, plaintiffs contend that Sherrow's fee could not be reasonable because he never reviewed the letters before they went to the mailing vendor. They focus on Sherrow's testimony that he could not remember whether he had opened a particular email containing 5,750 letters before it was sent to the mailing vendor. Based on this exchange, plaintiffs claim Sherrow did no work on any of the letters and offered no value in the process.

But there is evidence that Sherrow reviewed LDS's work. Gulledge testified that he absolutely expected Sherrow to validate or verify the letters. He then explained, "I do recall conversations with Billy Sherrow about the responsibility on him for auditing a certain percentage of the letters and the data that was provided by LDS, and I'm virtually certain that he did audit some percentage of those letters." Gulledge explained that he was confident in that regard because he recalled conversations in which Sherrow confirmed having audited the letters. Gulledge testified that Sherrow once told him "that he did some checking and that . . . the quality of the work was extremely high and that some of the checking that they had done had validated that the work provided by LDS was precise." As to whether Gulledge would expect Sherrow to open emails full of letters that were about to go to property owners, Gulledge said, "It depends. Early on I would expect a much more thorough review process. Early in the relationship I would expect a much higher level of review than a couple of years into the relationship when the quality and the process had been proven out and the quality was evident."

As it turned out, the expectation matched reality; Sherrow explained, "Over a period of time the performance of LDS [led] me to believe that they did their job. The data that they collected, which was reflected in the letters that they sent out, was correct. I'm not saying there was never a mistake, but it was basically accurate." In addition, Sherrow said it was not feasible to double check all of LDS's work on every letter, given the volume. Rather, his auditing "was

done based on the response"; when he learned of a problem with the information provided by LDS, Sherrow would contact Tax Ease or LDS to let them know.

William Abshier also testified that Sherrow verified a portion of LDS's work. He testified that Tax Ease expected Sherrow to verify around ten percent of the information received from LDS and that Sherrow said he would do so by checking the information from counties with online databases and sending staff to the rural county offices. Abshier believed that Sherrow did some verification, explaining that he had "receive[d] e-mails rejecting certain batches, saying . . . hey, we think we may have a problem on this one, or hey, . . . I looked this guy up and I don't think this is right." Abshier could not, of course, definitively state the percentage of notices that Sherrow actually reviewed.

But even if Sherrow did not open a particular batch of mass letters before sending, that would not mean that he did nothing for Tax Ease. Sherrow drafted some of the letters that were later populated by LDS and consulted on all of them. Plaintiffs make much of the fact the fifty-day letter used by Tax Ease was the one originally used by Lawson, albeit with minor tweaks. But Sherrow testified that he drafted a different fifty-day letter and that even though Tax Ease did not ultimately use his letter, he reviewed and approved the alternative letter Tax Ease used.

The record shows that, even if Tax Ease preferred a different format than Sherrow's templates, Sherrow nonetheless reviewed the contents of the letters and offered input. For example, Gulledge testified:

> So the other thing that we did was, when we engaged Billy Sherrow, we wanted his counsel—again, we were only using one attorney at the time and trying to do the best job that we could and maintain being as statutorily compliant as possible, we wanted Sherrow's opinion on how he thought we should tweak the letter. Again, we had sent letters of our own, we had sent letters through Virginia Lawson. Now working with Billy Sherrow we wanted his opinion.

> And if I remember correctly, there were only very minor subtle tweaks to the [fifty-day] letter, but we did change the letter.

Abshier also testified that Sherrow was involved in drafting the letters' content: "[A]s just one example [of] Sherrow's input, there was often a lot of spirited debate about whether to include federal debt collection practices notice, for instance, on the letter. It was our position that this is not a debt. . . . Sherrow wanted to be ultrasafe and include the notice."

Sherrow also answered follow-up communications from property owners. Plaintiffs make much of the fact that the notices contained Tax Ease's phone numbers and not Sherrow's. But there was a reason for that. Gulledge explained that Tax Ease wanted its phone number on the notices because it had the information to answer the calls received and "wanted to be able to handle the servicing aspect of that." But Sherrow did follow-up work in other ways. Gulledge testified: "[T]hat doesn't mean that if somebody walked into Sherrow's office because he had his address on there or if somebody looked up his phone number and called him that he wasn't expected to answer some general questions or to, you know, respond to whatever inquiries that the property owner had." Similarly, Sherrow had testified that it quickly became obvious to him that people were going to call him even though his phone number was not on the notices. Sherrow even hired another employee to handle phone calls "[i]n response to letters and also in response to litigation phone calls, both."

Given the above, we conclude that the prelitigation fees were actual fees. We cannot say that an attorney performs no legal work simply because he deploys a form letter or even a letter drafted by the client. Sherrow vouched for the letters and sent them on his letterhead, thereby taking professional responsibility for them. And in attacking Sherrow's relationship with LDS, plaintiffs lose sight of the fact that LDS worked *on Sherrow's behalf*. As the district court noted, and as plaintiffs do not meaningfully dispute, an attorney may rely on nonlegal vendors to perform

nonlegal work, so long as the attorney is "ultimately responsible for rendering competent legal services." Plaintiffs have produced no material evidence that Sherrow, though assisted by LDS, performed no actual work in relation to the notices.

But were the fees reasonable? Plaintiffs contend that it was unreasonable to send so many notices; according to plaintiffs, the notices served no other purpose than to make money. Yet, plaintiffs offer no evidence of how many prelitigation notices are commonly sent by other third-party purchasers. And Tax Ease had a legitimate, collection-related reason for sending quarterly notices after the fifty-day notice:

> [F]rom our experience, a lot of the reasons certificates of delinquency exist is because the property changes hands and the PVAs aren't always quick to update the PVA information. A lot of times that falls on the new owner and for multiple reasons they won't be quick to update it. So by being able to send more letters that are cheaper . . . and by doing the updates every time we send a letter, we're able to catch that change of ownership when the PVA does finally get around to updating it, so we can actually get a notice in the property owner's hand and create a dialogue that would hopefully lead to a redemption.

In addition, although plaintiffs claim the prelitigation fees were unreasonable, they provide no evidence to show what a reasonable fee for the notices would be. The record contains only one indicator of what the market would bear, and it favors a finding of reasonableness. Lawson, the attorney who handled the notices for Tax Ease before Sherrow was retained, charged between $75 and $125 per letter. And for that fee, she did not do any research to verify that the property owner data was correct, nor did she perform any of the other work LDS provided. She was unwilling to take a lower price and unwilling to use LDS. At the time these plaintiffs were involved in the collection process, Tax Ease charged fees below or at the low end of Lawson's prices. In fact, Gulledge testified that using LDS allowed it to charge roughly half of what Lawson was charging per letter.

In addition, two post-2007 amendments to Ky. Rev. Stat. § 134.452 confirm that neither the number of notices sent nor the amount charged for each letter was unreasonable, even if the amendments do not directly control this case. First, the General Assembly has now deemed "reasonable" any fees and charges falling within the amounts allowed by statute. *See* Ky. Rev. Stat. § 134.452(5) ("The General Assembly has carefully considered the fees and charges authorized by this section, and has determined that the amounts established are reasonable based on the costs of collection and fees and charges incurred in litigation."). All the prelitigation fees charged to plaintiffs fell at or around the statutory maximum, and thus would be deemed reasonable under the General Assembly's current formulation. Second, § 134.452(1)(c)(3) now says that a third-party purchaser may charge up to $175 in prelitigation fees for each notice sent, so long as the third-party purchaser only charges for one notice every ninety days and does not exceed the $700 statutory maximum for prelitigation fees. The fees charged by Tax Ease to plaintiffs for each notice, usually around $75, fell far short of the now-allowable $175. We acknowledge that these amendments are not retroactive. Nonetheless, Kentucky law tells us that the determination of reasonable attorney's fees "should be done with a view to common sense realism." *In re Citizens Fid. Bank & Tr. Co.*, 550 S.W.2d 569, 570 (Ky. Ct. App. 1977) (citation omitted). Employing that metric, we cannot say that these fees, which fall within limits now expressly blessed by the Kentucky General Assembly, fall on the unreasonable side. We conclude that plaintiffs have failed to show a genuine issue of material fact regarding the prelitigation fees.

B.

We turn next to the title-report fees and costs. Ky. Rev. Stat. § 134.452(3) allows a third-party purchaser to collect "actual, reasonable attorneys' fees and costs that arise due to the prosecution of collection remedies or the protection of a certificate of delinquency that is involved

in litigation." Plaintiffs challenge whether the fees and costs charged by Tax Ease for BGA's title-report work were actual and reasonable.

Nicole Compary, a former manager at BGA, described BGA's vetting process as follows:

We would make sure the correct property was searched. We would compare our tax bill with the legal description or whatever information we had from the abstract that we got back. We would—if there wasn't a current mailing address or the correct owner, or if there were other owners, heirs, what have you, we would skip trace those people and try and provide the attorneys with the correct mailing addresses. And then we would look up . . . any of the interested parties, mortgage companies, what have you, we would look up their registered agent, the secretary of state, and provide that information to the foreclosure attorney.

BGA then provided "a cover summary page that we would send with the backup documents that were provided by the title life abstractor." Gulledge elaborated on what BGA offered:

One of the most valuable services that BGA provided was the negotiation, coordination, and procuring of title reports throughout 120 different counties in Kentucky. . . . BGA validated all of the various tax certificate information for a property on which an attorney was trying to institute a foreclosure action. . . . BGA verified the property information, the tax information, the parties of interest. They provided the backup for anybody that needed to be included in the lawsuit, judgment, creditors, mortgage holders, property owners. They produced all the relevant documents. They made sure that any abstract that was procured or used was complete, that the quality was there, that . . . any addresses for anybody that needed to be served was available. They verified the current information with the PVA.

William Abshier explained that BGA "would take all that information, put it into the format requested by the attorneys. And it was a proprietary format worked out between [BGA] and the attorneys. You would get it all typed up into that format and sent back to the attorney." Abshier acknowledged that a competent attorney could have handled the work that BGA performed, but because it was not strictly legal work, Tax Ease "didn't want our attorneys working on that portion of it. We wanted them doing attorney work, not back-office work."

Compary testified that the abstractors usually charged between $75 and $100 to pull the data. She explained that BGA did not simply forward the abstractor's work to foreclosure

attorneys, as the vetting process often led to further discussions about what the abstractors had missed. Compary testified that when BGA was at its busiest, it was "doing 600 of these abstracts a month."

Like the district court, we have little doubt either that BGA's process was valuable to the attorneys or that a fee for obtaining a title report is an actual fee. All parties agree that the attorneys had to get title reports before filing for foreclosure. BGA helped Tax Ease's attorneys avoid work that non-attorneys could do. BGA also provided all the relevant information in one packet, a convenience of perhaps understated utility given the volume of foreclosures Tax Ease and its attorneys were handling.

As to the reasonableness of the fee itself (either $300 or $400 for the named plaintiffs), we conclude that Tax Ease was entitled to summary judgment in this respect as well. Attorney Lawson, who had handled Tax Ease's foreclosures before Sherrow took over, was asked during her deposition whether "you typically pay $400 or more for a title report for a residential foreclosure." Her response: "It depends. Some counties you do. Some counties you pay more, some counties you pay less."

Gulledge described the process by which BGA arrived at the roughly $400 title-report fee. He testified that "the flat fee idea was one that the attorneys were in favor of and seemed to make a lot of sense," given the fluctuating prices of abstracts and the high number of abstracts BGA would be purchasing. He explained that, to come up with the $400 figure, the company

> start[ed] with the cost of the abstract. And let's just say that on average, with fees, et cetera, I think we were probably paying in the 135 range. Sometimes it was more, sometimes it was less. Then there was the cost of labor to get the title vetted. So we had title abstractors. I think the average that they could get done was about seven or eight a day and what does it cost to have somebody vet a title at the hourly rate we were paying them [$12 to $20 per hour].

Of course there was markup, said Gulledge: "I don't care what product I'm selling, if the raw material costs a certain amount, there has to be a margin in there. And not only a margin, but the raw material, the abstract, plus all the other things I described, you have to add those together, add your margin. Otherwise why would you be in business?" Larry Evans, Tax Ease operation manager, added his view on why BGA's markup was warranted: "[The title abstractors] would give us all the ingredients for the cake. The responsibility of [BGA] was to look at all of those components . . . . [BGA] would catalog that information and put it in a very clean format to give to the attorneys. So the action that they earned was taking all of these ingredients and putting it . . . in a cake and then giving it to the attorney."

Despite this evidence, plaintiffs suggest three reasons why the district court was wrong to find the title-report fees and costs reasonable as a matter of law. First, plaintiffs argue the district court erred by citing Eric Craig's testimony as proof of reasonableness. Craig, a defendant in this case and an attorney who worked with BGA and Tax Ease, testified, "I think in general we were getting more value than we were paying BGA. And actually I can tell you that for a fact because . . . we had vendors out there that were charging us over $500 for the same exact titles and giving us less product, less analysis, less review."

This testimony supports a finding of reasonableness. But plaintiffs say that Craig's testimony was self-serving and not credible because Craig charged property owners $100 on top of the BGA fee, which he kept for himself. Yet even if we were to omit Craig's testimony as to the value of BGA's title reports, that would not undercut the other evidence described above indicating that BGA's fees were reasonable. Plaintiffs still must point to affirmative evidence indicating that a genuine issue of material fact remains given Tax Ease's evidence of reasonableness. *Hanrahan*, 905 F.3d at 953–54.

Plaintiffs also fault the district court for not discussing Nathan Miller's testimony. Miller owns Document Retrieval Network (DRN), which performed title searches for BGA. Miller testified that, for some parcels, DRN not only did a title search, but also conducted a review similar to BGA's subsequent vetting and charged BGA in some circumstances $45 for that process. According to Miller, even on a file where DRN did the vetting, BGA still marked up the title-report fees and costs by nearly $300.

Plaintiffs say Miller's testimony proves two things: (1) there are files in which BGA tacked on fees without doing additional work beyond the title search and vetting; and (2) the $45 fee is an example of a reasonable cost of the vetting process. But Miller's testimony does not create a genuine issue of material fact. Miller testified that he did not know what else BGA did on the file after DRN sent BGA the information. Nor was DRN involved in the drafting of the summary sheet, which BGA claims was an important part of the service it provided to the attorneys. And more importantly, DRN stopped offering a vetting service because the $45 fee was insufficient to justify it. Miller explained:

> We weren't profitable doing it. It took too much time. And even when our fees changed, I upped the fee, you know, at least once, if I remember well, and we still couldn't really make a profit. And at that time, we were very busy.
>
> At the end, it ended up being where we were, . . . on a good month, we were breaking even. But I mean, breaking even. There wasn't like a dollar left in profit. It was breaking even. And we were so busy at the time, it just . . . doesn't make sense, we can't do it anymore. So we stopped doing it. . . .
>
> [S]ometimes to find the name on-line, and to find their address, took a lot of time. Sometimes that was very easy. But sometimes that was hard, if the company wasn't active anymore, or the last known mailing address was from five years ago or something. They needed it to be a more up-to-date address.
>
> So those were hard. And . . . it was a time-consuming process really, typing the whole thing up. And for $45, . . . there wasn't a lot of money there, you know, by the time we actually—some of these would take us many hours . . . . We had some

that took five, six hours just to vet one title. That would be a bad title. But when you're only making $45, there's just not a lot of profit there.

Thus, Miller's testimony does not indicate that $45 is a reasonable charge for the vetting process, even without considering the additional work done by BGA on a given file.

Finally, plaintiffs chastise the district court for discounting the conclusions of BGA's former manager, Nicole Compary. Compary was asked during her deposition: "Compared to the . . . 75 to 100 that . . . BGA was paying the abstractors, did the value add[ed] seem comparable?" She responded, "No," with no explanation or elaboration. There was no follow up by the attorney. We also note that the record is devoid of the deposition page leading up to the question, so we are left without context. In any event, given the other record evidence, this statement alone does not create a genuine issue of material fact. Plaintiffs, therefore, have not shown that a genuine issue of material fact remains as to whether the title-report fees and costs were actual and reasonable.

C.

Plaintiffs finally argue that the district court erred by not granting its motion to compel Tax Ease to pay plaintiffs' expert witness fees pursuant to Rule 26(b)(4)(E). When the district court granted summary judgment, it made no mention of plaintiffs' motion to compel. In their post-judgment motion, plaintiffs asserted that "[f]or reasons entirely separate [from] the balance of this motion, the Court should alter its March 30, 2018 order dismissing this action because there is an unresolved motion to compel the defendants to pay for expert discovery as required by Rule 26(b)(4)(E)." When the district court denied the motion to alter the judgment, the court again made no mention of plaintiffs' motion regarding expert witness fees. Plaintiffs argue that the district court erred by implicitly denying their motion to compel.

Rule 26(b)(4)(E)(i) states, "Unless manifest injustice would result, the court must require that the party seeking discovery . . . pay the expert a reasonable fee for time spent in responding to discovery." Our circuit has little caselaw on Rule 26(b)(4)(E) or its predecessor (Rule 26(b)(4)(C)), and we have none at all regarding a district court's implicit denial of such a motion. Other jurisdictions, however, have reversed and remanded when a district court failed to give reasons for denying a motion pursuant to Rule 26(b)(4)(E). For example, in *Gwin v. American River Transportation Co.*, 482 F.3d 969, 975 (7th Cir. 2007), the Seventh Circuit explained that "before refusing to order a deposing party to pay the other party's expert, the district court must explicitly find either manifest injustice or that the fee was unreasonable." Because the district court there had not explained why it had denied the motion for expert witness fees, the Seventh Circuit reversed and remanded for the district court to address the motion. *Id.*; *see also United States v. City of Twin Falls*, 806 F.2d 862, 879 (9th Cir. 1986), *overruled on other grounds as recognized by Ass'n of Flight Attendants, AFL-CIO v. Horizon Air Inds., Inc.*, 976 F.2d 541, 552 (9th Cir. 1992).

We are reluctant to resurrect this case, given its labyrinthine procedural history, the underlying claims' lack of merit, and the district court's able handling of the motion for summary judgment. But we believe it appropriate to remand for the district court to exercise its discretion in resolving the multiple arguments raised for and against the motion for expert witness fees. *Cf. Foman v. Davis*, 371 U.S. 178, 182 (1962).

* * *

We AFFIRM the award of summary judgment in favor of Tax Ease but REVERSE the implicit denial of plaintiffs' motion for expert witness fees and REMAND for further proceedings as to that motion only.